THE, J.
Various questions have been elaborately discussed by the counsel in this case, two only of which, however, dpi propose to consider. These are :
Hirst, whether the defendants in error who were the plaintiffs in the court below, have made out a case entitling them to recover without showing the legal title which they claim to have derived under the sale made by the commissioner of delinquent and forfeited lands and the deed made to them by Commissioner Brown.
Second, whether such sale and deed did invest them with the legal title to the land in controversy so that they can recover on the strength of such legal title alone.
And, first, as to the right to recover without showing a legal title. If the plaintiffs holding peaceable possession of the land had been entered upon and ousted of such possession by the defendants having neither title to nor authority to enter upon the premises, according to a recent decisiou of this court they could have maintained ejectment upon their possession alone without showing a legal title. Tapscott v. Cobbs, 11 Gratt. 172. Or if the defendants were the tenants of the plaintiffs or the latter had the risfht to treat the former as such, then as they repudiated such tenancy and claimed to hold adversely, the plaintiffs might have recovered upon this ground without the necessit3r of showing a legal title, because being tenants the defendants could not dispute their landlord’s title. Willison v. Watkins, 3 Peters’ R. 43; Emerick v. Tavener, 9 Gratt. 220; Adams Eject. 3 n. 57 n. 247 n. 5, (ed. 1830) ; 2 Greenl. Ev. § 305, and authorities cited in n. 1.
That the defendants entered as trespassers cannot *be said with any propriety. Tiles’- entered under authority of the decree of the 17th of June 1840 made in conformity to that of the Court of appeals of the 18th of April 1840. By those decrees, the decree for the sale of the land at which Huston, under whom the plaintiffs claimed, had purchased was reversed and annulled; and it was not left an open question whether the purchaser would be disturbed by the reversal of the decree of sale, for the decree went on to set aside all the proceedings had in the original cause including the sale, in terms, and appointed a commissioner to reconvey to the heirs of George Clendenin the land which had been so sold. And this deed was afterwards regularly executed by the commissioner. It is true these plaintiffs were not themselves parties to the cause, but Huston’s heirs, and their immediate vendor Pitman, were, and they must stand on the footing of pendente lite purchasers and be bound by the decree. Thus the defendants obtained their possession under a bona fide claim of title and the authority of the decree of the court which restored to them all the rights of which they had been divested by the sale under the former decree.
But it is insisted that the plaintiffs had the right to treat the defendants as their tenants because the attornments made to them by Rader were unlawful and void, and that therefore they could not contest the plaintiffs’ title until they had first restored the possession.
*801 The general rule that a tenant may not dispute the title of him by whom he has been let into possession, cannot be questioned; but there is this modification, which is well established, that he may always show that his landlord’s title has expired or been extinguished since the lease, or that he has sold his interest in the premises, or that it is alienated from him by judgment and operation of law. Syburn’s lessee v. *Slade, 4 T. R. 681; Colemere’s lessee v. Whitroe, 1 Dowl. & Ryl. N. P. Cases, 1 (16 Eng. C. R. R. 409) ; Van Schaick’s lessee v. Davis, 5 Cow. R. 123; Rowden’s lessee v. Watson, 2 Stark. R. 230; Russell’s lessee v. Rowland, 6 Wend. R. 666, 670; Adams Eject. 247 & n. 6. So if these parties could have been considered as tenants, they would have had the right under this modification of the rule to show that since the lease to Rader the tille of the plaintiffs under which they got into possession had been extinguished by the decree of the Court of appeals and that of the Circuit court made in conformity to it. But they did not admit themselves to be tenants of the plaintiff’s, nor had the latter the right to treat them as such. They always claimed to hold adversely, and although they came into possession by means of the attornments of the plaintiffs’ tenant Rader, yet those attorn-ments were made under such circumstances that the liabilities of tenants were not created by them. They were made after and in consequence of the decrees by which these parties had been fully restored to. all their rights in the land and the title ot the plaintiffs under the previous decree and sale, had been extinguished. They had the right to enter and take possession if they could do so peaceably. The recoverer after judgment may enter without execution where the demand is certain. Thus after judgment in a common recovery the de-mandant may enter or take out execution at his election. Shelley’s Case, 1 Rep. 93, 106; Mary Portington's Case, 10 Rep. 35. The patron who recovers in quare impedit may present without a writ to the bishop. Rud v. Bishop of Rincoln, Hutton’s R. 66. And after a recovery in ejectment the lessor of the plaintiff may enter without the sheriff, for his assistance is but to preserve the peace. Siderf. R. part 2, p. 156. Withers v. Harris, 7 Mod. R. 64, 69; Badger v. Lloyd, Holt’s R. 199. And being thus entitled to enter, he cannot 'x'be considered as a trespasser for asserting that right unless his entry be attended with such acts of violence as will subject him to a criminal prosecution. Taylor v. Cole. 3 T. R. 292. Such an entry a fter judgment in ejectment works no disseisin of the freehold, nor can the true owner ever elect to make the person then in possession, a disseisor. He could not bring an assize of novel disseisin at common law; the entry is not injuste et sine judicio, but under authority of a court of justice and lawful, and therefore not liable to punishment by fine as every disseisin was. Tay lor ex dem. Atkyns v. Horde (1757), 1 Burr. R. 60, 113, 114; Doe ex dem. Atkyns v. Horde (1777) 2 Cowp. R. 689, 701. Being thus entitled to enter and take possession, no reason is perceived why they might not acquire it by the attornment of the tenant in possession. It was the duty both of his landlord and himself to surrender it in conformity to the decrees, and the taking of the attornments was not in fraud of the rights of the plaintiffs, nor did it violate any law. Eor the act of assembly (1 Rev. Code 1819, p. 370, $ 33). following the act of 11 Geo. 2, ch. 19, fj 11. while it declared that the attornment of <: tenant to any stranger should be void, unless with the consent of the landlord, expressly excepted such attornment made pursuant to or in consequence of a judgment of a court of law, or the order or decree of a court of equity. The attornment here was plainly in consequence of these decrees and was thus within the exceptions made in the act.
But it may be said that althoug'h this bo true in respect of the title which the plaintiffs claimed under the purchase from Pit-man, yet that after this purchase and after they had placed Rader in possession to hold as their tenant, they acquired an independent paramount title under the sale by the commissioner of forfeited lands and the deed made to them by Brown, which was not affected by the decrees in the chancery *case; and that when they became invested with this title, immediately their tenant Rader held under them in respect of it also, and that as to it, his attornment was void.
It may be true that as between the plaintiffs and Rader, the latter might be regarded upon the accession of the new title as holding under it also; but I am not prepared to agree that this would deprive the defendants of the benefit of the decrees. If the possession had been vacant, they were entitled notwithstanding the plaintiffs had acquired an independent title pending the chancery suit to enter upon the premises and take possession. If they had come with a writ of possession, the new title would have been no answer to the sheriff’s demand; and as when they did come the tenant in possession surrendered it to them and they entered upon it, I conceive they were in upon their own title and not as tenants, and that in either case the plaintiffs would have been put to their action upon Iheir new title. The rule too forbidding the tenant to dispute his landlords’ title would on the terms on which it is usually propounded, seem to relate to the original title under which he had been let into possession. See Adams Eject. 247; 1 Greenl. Ev. $ 24, 25; 2 Ibid, f 305. And it may be questioned how far these plaintiffs claiming under the purchase from Pitman and standing in privity with Clen-denin’s heirs could be allowed to set up against them a title acquired by forfeiture for non-payment of taxes. It might be i urged with great force that it was their *802 duty to protect the title against such forfeiture and that their purchase at the tax sale should enure to the benefit of those ascertained to be the true owners. But it is unnecessary to pursue these enquiries for in the most favorable view to the pretensions of the plaintiffs, we are only brought to.
The second question above stated, which relates to *the effect of the sale of the land as forfeited under the order of the Nicholas court and the deed made by Commissioner Brown in transferring the commonwealth’s interest and vesting in the grantees the legal title to the land described in the deed.
The sale was under an order made at the April term 1839, which after reciting that John G. Stephenson commissioner of delinquent and forfeited lands, had that day made a report of the forfeited lands in the county of Nicholas, directed him in general terms to make sale of said lands upon the terms prescribed by law. Stephenson after-wards reported that he had sold sundry tracts of land in obedience to said order, and amongst others “a tract of 3000 acres in the name of John Cantril,” which was purchased by Hazael Williams and Thomas McCleary at the price of sixty-five dollars and twenty-five cents, that being the amount of the taxes with the damages due thereon. At the April term 1840 this sale was confirmed. On the 9th of September 1841 Stephenson was removed from office, and John Brown appointed commissioner of delinquent and forfeited lands in his place; and subsequently Stephenson having never conveyed the land to the purchasers whilst he continued in office, Brown undertook to convey it by deed dated the 27th of May 1843. At the time of the execution of this deed there was another commissioner of delinquent and forfeited lands for the county of Nicholas, one Alexander Brown, who had been appointed at the April term 1841, and he had given bond and duly qualified as such, but he did not unite with John Brown in making it. And it is objected that the commissioners took a joint authority under the act, and that neither could act separately or without the concurrence of the other.
This objection, I think, cannot avail to affect the validity of this deed. It is true in some of the counties *in which more than one commissioner of forfeited and delinquent lands was appointed, it is understood that they have construed their authority to be joint and not several, and have acted conjointly in all their proceedings. Such however, I think is not the true construction of the act by which the appointment of such commissioners was directed. The object of the law in authorizing several commissioners in one county, was to speed the sales of forfeited lands in the large counties in which from the number of forfeitures, they could not be investigated and reported to the court and the numerous tracts sold by a single commissioner in a reasonable time. The power conferred was a several one to be exercised by each commissioner, who is afterwards throughout the act spoken of in the singular, and there is nothing whatever in any of its provisions to indicate that it was to be exercised by the commissioners, where more than one, conjointly. And it would have retarded rather than promoted the object which the legislature plainly had in view, to make the power joint instead of several. I am however of opinion that it has not been shown that Brown had any legal authority to execute this deed. He was not the commissioner who sold the land and who was authorized to receive the purchase money, nor has any order of the court been produced directing him to make the convej’ance. That he had been appointed a commissioner of forfeited land to supply the vacancy occasioned by the removal of Commissioner Stephenson did not of itself import an authority to make deeds for lands sold by his predecessor. By the act of 1837 it was the duty of the court in all cases to direct the deed to be made, and no deed could be made without such order; by the act of 1838, l 9, provision is made authorizing the commissioner by whom a sale is made to receive any purchase money before it is due, deducting the interest thereon from the time when paid *to the time when the same would become due and paj'able according to the terms of sale, and thereupon the purchaser became entitled to his deed for the land so purchased and paid for, upon application to the commissioner. But the commissioner thus authorized to convey without the order of the court was he who made the sale and received the money. The words are “upon application to the said commissioner,” referring to the one who had made the sale and received the money. No other would be authorized to collect or receive the purchase money of lands sold, without an order of the court, nor could the successor of a commissioner who had died or been removed from office know personally or undertake to recite that the money had been paid in advance to his predecessor. In such a case the proper course is for the purchaser to apply to the court and upon proving that the purchase money has been duly paid by reference to the report of sale if it showed it or by extrinsic evidence if it did not, to ask an order directing some other commissioner to make the deed.
In Walton v. Hale, 9 Gratt. 194, the president of this court says “the commissioner to make sales under the delinquent land laws * * * has no interest in the subject of sale. He acts like a commissioner to make sales under a decree of the Chancery court and is clothed with a mere naked authority.” It was therefore held that the deed of such a commissioner could avail nothing where his authority to make it did not appear, as in that case where the commissioner had undertaken to make the deed to a person other than a purchaser at his sale.
In Rockbold v. Barnes, 3 Rand. 473, which *803 was the case of a sheriff’s sale of delinquent land, the deed purported to be made by the deputy sheriff, and it was held that to make it evidence of transfer of title it should be proven that the principal was sheriff and *that the party who undertook to convey was his deputy. In Wilsons v. Bell’s lessee, 7 Leigh 22, which was a similar case, the sale had been made by the sheriff, but the deed reciting such sale was made and acknowledged by the deputy as his own act, though it purported to be the deed of the principal. The deed was rejected as evidence of title," and the judgment was affirmed. In that case the opinion is expressed that where in such a case the sale is made by the sheriff, the deed cannot be made by the deputy and vice versa; and Tucker, P., refers to the terms of the act as fortifying “the natural supposition that he who makes the sale is to make the title.” In Flanagan v. Grimmet, 10 Gratt. 427, Allen, P., refers to a case decided by this court, Keezee v. Leece (not reported), in which where the sale had been made by a deputy but the deed executed by the sheriff, the objection to the deed was overruled and it was suffered to g'o to the jury, and this court affirmed the judgment. But if in that case the correctness of the distinction implied in the opinions of the judges in Wilsons v. Bell’s lessee (above cited) between the sheriff and his deputy, was doubted or disaffirmed, certainly I think, it will not be questioned if predicated of a sheriff and his successor in office or of a commissioner of forfeited lands and his successor.
The deed executed by Commissioner Brown, it is true, recites that it was made in pursuance of an order of the court made oil the 9th of September 1841 directing the acting commissioner- to convey the land to the grantees. No such order is produced, and the mere recital of authority in such a deed would not be evidence against others asserting an adverse claim. Carver v. Jackson, 4 Peters’ R. 83; Wiley v. Givens, 6 Gratt. 277; Walton v. Hale, 9 Gratt. 194. The presumption I think is that there Was in fact no such order, but that the order of the 9th of September *1841, appointing Brown successor of Stephenson was construed (erroneously I think) as importing a direction to make deeds for lands sold but not conveyed by his predecessor, I think the deed was ineffectual for want of a sufficient authority in Brown to make it; but there is another objection which is perhaps equally fatal.
The report of the sale made by Commissioner Stephenson merely describes the land as “one tract of 3000 acres in the name of John Cantril * * * lying on waters of Gauley river and Beaver creek, ’ ’ and the order confirming the sale describes it as “3000 acres sold in the name of John Can-tril. ’ ’ The order for the sale is a general order directing the sale of the lands forfeited within the county of Nicholas according to the report of the commissioner made on that day. But this report is not produced, why, the record does not disclose, though it was stated in the course of the argument that it had been lost; and we cannot know that it ever was reported as forfeited except so far,as we may infer it from the fact that it was reported as having been sold as such and the confirmation of that report. But what was the description given of it in the report of forfeiture, if such there was, we are not informed, nor can we undertake to say from the record of the proceeding as we have it, that the ‘ ‘3000 acres in the name of John Cantril on the waters of Gauley river and Beaver creek,” is the same three thousand acres granted to George Clendenin, or that it was the survey on which George Rader lived on Stroud’s creek, nor does it inform us what John Cantril had to do with the three thousand acres granted to George Clendenin. Whether he claimed the whole tract or an undivided interest in it on behalf of his wife who it was proved on the trial of this cause (though it does not appear in the proceeding for the sale) was one of the heirs of George Clendenin, we *are unable to learn, nor whether the entire tract was reported as forfeited or his undivided interest only. We cannot suppose that it was reported as forfeited as omitted land because not entered in the name of George Clendenin or of his heirs, because it is treated as forfeited for non-payment of taxes charged to John Cantril, and also because it is clearly proven that at the date of the act of 1835 the land was in the actual possession of parties claiming under tire Clendenin title, and therefore not liable to forfeiture as omitted land. All these difficulties Commissioner Brown undertakes to resolve. He identifies the “3000 acres in the name of John Cantril on waters of Gauley river and Beaver creek,” with the tract granted to George Clendenin on the north side of Gauley river, including Stroud’s improvement and the several branches of Stroud’s creek and a branch of Beaver creek, referring to the patent for the boundaries; and he ascertains that the whole interest in this tract had been forfeited in the name of John Cantril; and accordingly undertakes to convey it to the purchasers at the sale made by Stephenson. In doing this, even if he had had authority to make a deed, I conceive that he went out of the chart prescribed to him by the record and transcended his authority in undertaking to identify the land sold by Stephenson by elements of description furnished by himself outside of the record.
On both the grounds stated I think the deed of Brown was invalid to convey title to the land in controversy, or at least that its validity is not shown by the record before us, and that the Circuit court should have given the second instruction asked for by the defendants, and should have also sustained the motion to set aside the verdict and grant a new trial.
I am of opinion, therefore, to reverse the judgment and remand the cause for a new trial, upon which the parties may, if the5' *804 can, supply the defects in the record *on which they rely; and as the other questions that have been raised may not arise upon such future trial, I forbear at this time to express any opinion upon them.
The other judges concurred in the opinion of Tee, J.
Judgment reversed.